

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-21-00161-CR
No. 02-21-00162-CR

---

ANTHONY DESHON JENNINGS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court Nos. CR19-00923, CR19-00924

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury found Appellant Anthony Deshon Jennings guilty in two cases of aggravated assault with a deadly weapon (a firearm) arising from an incident involving complainants Martin "Chino" Ibarra and Sarah Brule. *See* Tex. Penal Code Ann. § 22.02(a)(2). Jennings pleaded true to two prior and sequential felony enhancement allegations, increasing each offense's punishment range to twenty-five to ninety-nine years' confinement or life. *See id.* §§ 12.33, .42(d). The jury assessed thirty years' confinement in each case, and the trial court set Jennings's sentences to run concurrently.

In three points, Jennings appeals, arguing that the trial court erred by overruling his motion for a directed verdict, by failing to instruct the jury to disregard the prosecutor's improper comments on his failure to testify, and by admitting into evidence a booking photo provided to the defense on the morning of trial. We affirm the trial court's judgments because the trial court did not err by denying Jennings's directed-verdict motion and because Jennings did not preserve his jury-instruction complaint and was not harmed by the photo's admission.

## II. DIRECTED VERDICT[1]

In his third point,[2] Jennings complains that the trial court erred by overruling his motion for a directed verdict because there was no evidence of a deadly weapon and no evidence of an imminent threat, i.e., that Ibarra and Brule actually feared him.[3] A motion for directed verdict is essentially an evidentiary-sufficiency challenge. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990).

Jennings was charged with, on or about September 27, 2019, having intentionally and knowingly threatened Ibarra and Brule with imminent bodily injury while using or exhibiting a firearm. *See* Tex. Penal Code Ann. § 22.01(a)(2) (defining assault to include intentionally or knowingly threatening another with imminent bodily injury), § 22.02(a)(2) (defining aggravated assault to include committing assault while using or exhibiting a deadly weapon). In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

---

[1]We combine our evidentiary review with our analysis to avoid repetition.

[2]We reorder Jennings's points to address those providing the greatest potential relief first. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010).

[3]Jennings divides his complaint between legal and factual sufficiency, but that is no longer the standard. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

3

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in the verdict's favor and defer to that resolution. *Braughton*, 569 S.W.3d at 608.

## A. The State's case

Three police officers and the two complainants testified during the State's case.

### 1. Police officer testimony

Investigator Ronald Alford[4] had worked on the case with the assigned investigator, Michael Young, who was home sick during trial. During the investigation, he and Investigator Young reviewed Brule's 911 call from September 27, 2019; he described Brule's voice in the 911 call as "excited and upset."

---

[4]Investigator Alford had worked for the Gainesville Police Department for almost eighteen years and had spent three and a half of those years as a gang-unit officer before working in criminal investigations.

The trial court admitted into evidence the ninety-second 911 call, which was published to the jury. The call began with Brule's telling the 911 operator that she needed "a police officer over here immediately" to her home because she "just had Anthony Lovato pull a gun on [her]." When the operator asked if he was still there, Brule replied, "No, but he was -- come now, please. Y'all can find him. He's driving a gold Yukon [with the back window busted out] . . . and he's got a gun wrapped up in a white rag that he just . . . I was raking my front yard." When the operator asked, "Now, is that Anthony Jennings?" Brule replied, "Yes, whatever his name is, yes."[5] When the operator then asked, "And he has the gun wrapped up in a white . . . ," Brule replied, "Yeah, and he pointed it at me." As the operator attempted to ask in which direction Jennings had gone, Brule demanded, "How does he not get locked up?"[6] When the operator re-asked her question about the direction Jennings had gone, Brule replied, "He left towards Harris Street." Brule then stated, "I'm not having this. I'm not having this. I was raking my front yard. I'm not having this."

---

[5]Investigator Alford testified that Jennings used multiple names, including Anthony Lovato, Anthony Royal, Anthony Guwap, and Slimey Lovato.

[6]Investigator Alford opined that Brule's exclamation was indicative of frustration but possibly not fear over "someone who's . . . able to just do whatever they want and get away with it." He agreed that it could also have been an expression of frustration with law enforcement.

Officer Johnny Freeman[7] was the first officer to respond to Brule's 911 call. When he arrived, Brule, upset and tearful, was in her front yard. She did not appear to be intoxicated,[8] and she coherently explained the situation to him. He took her statement but did not complete the call because he was "just responding to assist" as the closest officer in the area when the call came in. He was one of three officers who responded to the scene.[9]

Investigator Alford stated that he spoke with Jennings at the Cooke County jail almost a month later, after he and Investigator Young read the *Miranda*[10] warnings to him and Jennings agreed to speak with them. Jennings had recounted his version of events to the investigators as follows,

> He advised that he was driving through the area and he stated that Brule yelled at him, and that he came back around over there and rolled down the window, and I believe the words were he asked her what's up or something to that effect.
>
> And she started yelling at him, about being a woman hitter or something to that effect, and that he started asking where Chino [Ibarra]

---

[7]Officer Freeman, a licensed peace officer since 2009, had worked for the Gainesville Police Department as a patrol officer for a little over two years by the time of the October 2021 trial.

[8]Brule testified that she took Prozac and Clonopin by prescription for her bipolar disorder but denied having been on anything that day, although she acknowledged having used street drugs "a long time" ago.

[9]Officer Freeman stated that his body camera had recorded his interaction with Brule, but no one offered the body camera footage into evidence.

[10]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

was. Chino is Brule's boyfriend at the time. I'm not certain if they're dating still. But asked where he was.

She goes and gets -- gets [Chino]. He comes out, some additional words were exchanged. When [Jennings] was asked if he pointed at her or did anything to that effect, he stated he did not.

Jennings told the investigators that he was "really good with his hands[,] so there[ was] no reason for him to have a gun," and that Brule told him that he needed a bullet in his head.

Investigator Alford testified that he had been dealing with Jennings since Jennings was a juvenile.[11] Although he had arrested Jennings a number of times, he did not recall Jennings's ever having a gun during those arrests. Officer Freeman said that he had had very few dealings with Jennings but did not see a firearm on those occasions.

Investigator Jack Jones[12] had investigated reports of Jennings that alleged firearm use, but Jennings had never been in possession of a gun when arrested by Investigator Jones or anyone else in his agency. During his time in the gang unit, Investigator Jones had investigated Jennings, who had been entered into the

---

[11]Jennings was twenty-four years old at the time of the trial.

[12]Investigator Jones had worked for the Gainesville Police Department for twenty-four years, during which time he had worked in patrol, special investigations, narcotics, gang enforcement, and criminal investigations.

Department of Public Safety's gang investigative database on February 21, 2014.[13] Investigator Jones said that Jennings's inclusion on the database would not expire until May 26, 2024; he had no personal knowledge about whether Jennings had removed himself from the gang. Investigator Jones was not present when Jennings was interviewed by Investigators Alford and Young, and he did no follow-ups to try to find a gun.

Investigator Alford testified that the tattoos on the left side of Jennings's forehead depicted a firearm, a light socket plug, and a dollar sign. He stated that based on his training and experience, a social-media post with these particular "emojis"[14] meant dealing with firearms and drugs (a "plug" means drug supplier). He agreed that "a whole lot of rap songs" talk about guns, plugs, and money but opined that Jennings's facial tattoos probably indicated more than a favorite rap song.

---

[13]According to Investigator Jones, the legislature set gang-database inclusion criteria such as clothing, tattoos, and other items. *See* Tex. Code Crim. Proc. Ann. arts. 67.251–.256 (describing electronic gang resource system "to provide criminal justice agencies . . . with information about criminal street gangs in this state"). *But see id.* art. 67.253 ("Information relating to the identity of a specific offender or alleged offender may not be maintained in the gang resource system.").

[14]"Emoji are images, symbols, or icons used in online communication (that is, communication via cell phone text messaging, electronic mail, personal or instant messaging, chat rooms, bulletin boards, or similar) to convey information, emotion, and attitudes." Marilyn M. McMahon & Elizabeth A. Kirley, *When Cute Becomes Criminal: Emoji, Threats and Online Grooming*, 21 Minn. J.L. Sci. & Tech. 37, 38 (2019). "Just as non-verbal behavior such as pitch, volume, speed of speech, gestures, and facial expressions fundamentally informs our verbal communications, emoji can also improve one-dimensional texting and posting by adding emotion, sociability, and humor." *Id.* at 41 (footnotes omitted).

During cross-examination, Investigator Alford acknowledged that he had known Ibarra for a number of years and had been told while on the gang task force that Ibarra was in a gang, but he said that Ibarra did not consistently come up as someone involved in Cooke County gang activities. Around the time of the September 27, 2019 incident, there had been up to twenty active gangs in the area, including the Norteños (Jennings's gang) and Satan's Disciples (the gang with which Ibarra had been associated). Investigator Alford stated that the Norteños were involved in criminal activities from assault to murder, and he agreed that there was a great risk of retaliation in standing up to a Norteños.

Regarding Brule, Investigator Alford stated, "I wouldn't say that I know her well. I know of her. I've talked to her a few times off and on throughout the years through law enforcement contacts," various criminal investigations and follow-ups, and "probably a traffic stop or two." He did not know her well enough to know if she had been faking her distress in her 911 call.

### 2. Brule's testimony

At the time of the trial, Brule lived in the same house in Gainesville where the September 27, 2019 incident occurred, but she and Ibarra were no longer together. She lived in the house with her sister and six children, three of whom were Brule's. She worked from home so she could care for one of her daughters, who was disabled.

Brule testified that on September 27, 2019, she had been raking her yard after Ibarra finished mowing. She wore earbuds to listen to and sing along with music

9

while she raked. A gold SUV drove by a few times, but she did not think anything of it until, on the third pass, Jennings stopped in the middle of the street, rolled down the window, and asked her several times if she had a problem in a "[d]emanding, upset, kind of riled up" tone. Brule stated that she did not know Jennings—they did not run in the same circles—but that she knew who he was because of an incident that had involved her sister.

When Jennings asked her if she had a problem with him, Brule told him to leave in a belligerent, profane manner. She also told him, "[Y]eah, I do have a problem with you, you just broke my sister's collarbone."[15] Brule said that her sister's injuries had occurred two weeks before the encounter, "so it was a fresh wound on [her] and [her] family." Brule testified that Jennings replied, "B-tch, I'll beat your -ss, too," and he told her to go into the house and get Ibarra.

Brule went inside the house, where Ibarra was getting dressed after taking a shower, and he went outside with her to talk to Jennings. Brule recounted the conversation as follows,

Q. All right. So tell me what happened then?

A. Chino proceeded just to tell him: You know, come on, bro, just go, just get out of here, just -- just leave, just go, just leave, we don't need this over here. And just kept telling him to leave, and [Jennings] just kept asking -- [Jennings] kept asking him what the problem was, and

---

[15]The trial court overruled Jennings's hearsay and relevance objections to this evidence, and Jennings does not complain about this evidence on appeal.

10

Chino told him over and over, There's no problem, there's no issue, but you need to leave, you need to leave.

Q. Okay. Were they talking in any -- anything about gangs or anything at that point that you remember?

A. Chino wasn't. He just kept telling him to leave. [Jennings] was saying some kind of gang jargon, I don't know what it was exactly, but it was something, and Chino told him, I don't even bang no more, I don't do any of that no more, you just need to get out of here, my kids are in the house.

Q. Okay. So he was kind of, I think, trying to rile him up, talk about his gang, bad mouthing --

A. Correct. Correct.

Q. -- his gang, something like that?

A. Yes.

Q. Okay. And did -- after that, what happened? After the gang or -- I think this all kind of happened at once, but just keep telling us what happened.

A. So from there, after he kept telling him to go, I'd already kind of just start to turn, to walk in, and he had popped off and yelled something, so it got my attention. I turned back around, and Chino just told me, run, and about that time, that's when everything happened.

Q. Okay. Well, tell us what -- so you -- y'all decided it's about time to go inside or whatever, but did you -- when you turned and you say everything happened, what did you see?

A. He had a pistol pointed at us with a white cloth over it, and so we just took off and ran as quick as we could into the house.

Q. Okay.

A. And Chino said, he's got a gun, run.

11

Q. What was Chino's expression like when he said that?

A. You could -- it's scared, fear. You could see it in his face, frustration.

Q. Do you -- have you -- had you seen Chino like that many times?

A. No. Chino is not really scared of a whole lot. But he was that day, I -- I feel, in his face. We were together for seven years. I know him pretty well. But the fear in his face was not something that I had ever seen, because Chino isn't scared of anything.

The encounter lasted around eight minutes. When Jennings drove away, Brule gathered her kids in the back of the house and then called 911.

Brule stated that she did not want to testify or to be in court. When asked if the situation had caused her fear and stress, she replied, "Very much so, yes, horribly," including stress caused by contacts from Jennings's family—mostly by his wife but also his mother. The record reflects that Brule was crying during this portion of her testimony.

On cross-examination, Brule testified that she and Ibarra were not married but had a child together. She had always known Jennings by the name Lovato and had been afraid of him when she recognized him that day; she did not immediately go into her house when he pulled up because she initially did not recognize him. She denied that Jennings stopped his car when she yelled out, "[M]otherf-cker, you need a bullet in your head." She agreed that approximately an hour after the encounter, she "Facebooked" Jennings and told him that she did not know he was in that car.

Regarding her Facebook messages with Jennings, Brule said that she "made several false statements" to him, including that she did not see a gun and that she was not afraid of him. Brule denied that she had told Jennings that she thought he was going to kill her but testified that she was afraid that he was going to kill her at some point.

Brule stated that she did not recall Jennings's asking her why she had said that he needed a bullet in his head and that if he had asked her that, she would not have responded, "[Y]eah, because I'm crazy as hell." Defense counsel then offered into evidence, and the trial court admitted, the Facebook messages exchanged between Brule and Jennings.

The September 27, 2019 Facebook conversation showed that around 6:31 p.m., Brule and Jennings exchanged messages in which Brule denied that she had known Jennings was in the vehicle and stated that she did not care what he had done to her sister and that she was not afraid to die. She used an eye-rolling emoji when she told him, "I won't f-cking rake my yard and listen to music since you gonna kill me and Chino for all that." Jennings replied, "Kill y[']all?" and Brule responded, "Yeah[,] isn't that what you said[?] [laughter emoji] I'm really not on pills[,] dude[.] This is dumb."

Jennings then stated, "No[,] you the one that said I need a bullet in my head." Brule responded, "Cause I'm crazy as hell[.] My sister always said you will kill me[.] So I thought it was the truth." Jennings stated, "No reason to[.] I fight before I shoot[.]" Brule replied, "You said you would whoop me because I said you broke my sister[']s collarbone[.] You been through sh-t but I'm old and I been through sh-t

13

to[o] f-ck it half the time I wish someone would pull the f-cking trigger. So yeah the whole fighting killing sh-t[,] I'm not sure why." Jennings told her that it had been a misunderstanding and to "[h]ave a good day[.]" Brule responded, "You too," followed by a peace sign emoji.[16]

Later, Jennings asked Brule, "Y[']all called the cops and said I had a gun?? Craaaaazy[.]" In her response to him, Brule blamed her neighbor[17] and told Jennings that Ibarra had said that Jennings had a gun but that he did not talk to the police.[18] She also told Jennings, "If I called the cops[,] I wouldn't have messaged you[.]" Jennings replied, "You good. Is what it is." Brule then elaborated, stating, "Chino

_____

[16]Brule also told Jennings in her Facebook messages that Ibarra did not know she was corresponding with him and that he "hates if [she] get[s] in the business" but that she "just wanted [Jennings] to know [she] didn't say nothing." Brule told Jennings that she was going to tell Ibarra about their messages, "Just not tonight because he will whoop me," followed by five laughter emojis and "just kidding[.]"

During cross-examination, Brule said that by "the business," she meant "guy business" or "men business" and not drug-dealing. She acknowledged that she and the father of two of her children had served time in federal prison in 2007; Brule's incarceration had been drug-related. Brule testified that she had not been back to prison since then and that she had a stable home and job, was raising her children, and had nothing to do with gangs or drugs.

[17]On redirect, Brule claimed that what she had said in her message was untrue and that she had told Jennings that the neighbor had called the police because she had been scared and just wanted Jennings "to be calm and hopefully smooth it over to where nothing happened to us." She added that she and Ibarra had both spoken to the police but that she had lied to Jennings because she "didn't want him coming back and shooting [her] house up."

[18]Investigator Jones testified that he went with Investigator Young to Brule's house to interview Ibarra.

14

wasn't even outside when the cops came 4 deep to my house[.] But I'm not gonna act scared or explain myself[;] I really have no issue with you[.]" Jennings replied, "Lol I just saw the report [laughter emoji] Lol y[']all cool have a good night."

Brule then told Jennings, "The f-cking neighbor called and then the [police] asked me who it was[;] I told them[,] but you had to have pulled out a gun and I was turned around because this white lady does not play . . . I don't know what I've done to you[;] we don't even know each other." Jennings replied, "I didn[']t have no gun." Brule then responded that both the neighbor and Ibarra had said that they had seen a gun but that she had not seen one. Jennings told her, "I didn[']t have no gun [laughter emoji.] The cops just told me y[']all made a report lmao it's all good though. You was there the whole time[;] I never had a gun."

Five days later, on October 2, 2019, at 3:01 p.m., Brule missed a video-chat call from Jennings. She sent him a message at 4:26 p.m., stating, "What's up[?] I just got outta jail[.] If it's about [Investigators] Jones or Young[,] I told them to go f-ck themselves[.]"[19] Jennings asked, "Jail for what?" At 7:33 p.m., Brule replied, "Assault causing bodily injury[.]"

During recross-examination, when Brule denied having told anyone that she did not want the case prosecuted, defense counsel offered an email she had sent to

_____

[19]During cross-examination, Brule denied having continued to communicate with Jennings after September 27, 2019.

15

Investigator Jones, and the trial court admitted it into evidence. In her October 7, 2019 email to Investigator Jones, Brule stated,

> I hope all is well with you. Chino told me you and Young came by about the gun situation with Anthony Lovato/Jennings. At this time I do not want to p[u]rsue charges against him. I feel that it will just make my family a target, . . . I appreciate you always, and I'm sorry but I have to keep my family safe and watch what I do with the police from here on out. I am becoming a joke around there it seems. I just want peace and to move. However, if you would like to talk to me my new number is [XXX-XXX-XXXX].

Brule denied that she had told anyone that the prosecutor wanted her to testify or that the prosecutor had offered her a deal.

### 3. Ibarra's Testimony

At trial, Ibarra testified that he had lived in Irving for the previous four or five months with his girlfriend. He had known Jennings—with the last name Lovato—"[s]ince [Jennings] was in diapers." He had not wanted to testify but had been subpoenaed and understood that he had to tell the truth. He did not want to testify because "[y]ou don't tell on people no matter if they've done good or bad for you, you just -- you just don't."

On September 27, 2019, he had been living with Brule, their son, and Brule's two daughters. He was in the back bedroom getting dressed after his post-yardwork shower when Brule ran into the house and said, "Hey, Anthony Lovato is out here talking sh-t to me." Ibarra put on his prosthetic leg and finished dressing before going outside to talk to Jennings.

16

When Ibarra went outside, Jennings's SUV was by the neighbor's fence, but when Jennings saw him, Jennings reversed the vehicle and parked in front of the house. He asked Jennings, "What's up, bro?" Jennings replied, "Your b-tch is talking sh-t." Ibarra said that he asked Jennings to "take that down the road," and Jennings replied, "Well, you need to check her. I don't know if she's on pills or what's going on with her or whatever." Ibarra denied that Brule had been on anything but prescribed medicine that day.

Ibarra testified that while he spoke with Jennings, Brule was "yelling, like, back and forth" with Jennings and that "it was getting like real noisy, real like drama-type situation." Ibarra tried to push her behind him and move her into the house because he had been in that type of situation before. He explained, "[I]f [Jennings] wasn't getting out of the vehicle, he wasn't looking for no physical confrontation," but he thought Jennings had been on drugs "because you don't just pull up to somebody's house and just threaten[ ] somebody that you've never had an issue with."

Ibarra had tried to defuse the situation because he did not know Jennings's state of mind and because, as a former felon,[20] he had no gun to protect himself. Then he saw Jennings's gun. Ibarra stated,

> So when I was telling [Brule] to get in the house or whatever, I saw [Jennings] put this hand on the window rest, and he had a white towel and he had the pistol under the white towel. And he looked at me and

[20]Ibarra had been convicted of deadly conduct and possession of ammunition and had been released from the penitentiary in 2002.

17

he said, ["]I'm going to pop that b-tch.["]  So when he said that, I said to Brule, ["]Man, get your -ss in the house.["]

Ibarra said that Jennings was not aiming the gun at him when he said he was going to "pop" Brule.  Jennings also said something about "disciple killer, S.D. killer,"[21] but Ibarra did not pay any attention to it, assuming Jennings was trying to rile him up.

Ibarra stated that Jennings's gun had been a snub-nosed Glock that was completely covered by Jennings's "little face towel."  He also testified that it was "like a Glock 40."[22]  Ibarra said that he had been around plenty of guns and there was no question in his mind that what Jennings had was a gun, which Jennings had brandished in his right hand with the towel on top.  Ibarra stated, "He just laid it on the edge of the window sill, pointed in our direction.  But I couldn't tell you if it was pointed at me, at [Brule], at the house, at the front door, window."  The gun was pointed in their direction but the sights were not lined up on them, meaning that if Jennings had pulled the trigger, he could have hit Ibarra, Brule, the house, or something else in their direction.

_____

[21]As noted by Investigator Alford, Ibarra had been associated with Satan's Disciples.  Ibarra testified that he was no longer actively involved in any gangs.

[22]When shown a manufacturer's photograph of a Glock 40, which was admitted into evidence and published to the jury, Ibarra agreed that the gun in the photo was not a snub-nosed pistol.  He agreed that a Glock 40 was a 10-millimeter pistol but corrected his earlier testimony, stating, "What I said was a Glock, not a Glock 40.  'Could have been Glock 40[,]' were my exact words."  He had a brief glance at the gun when Jennings put the towel over it and insisted that it had been a Glock.  On redirect, Ibarra agreed that the photographic exhibit was of a full-sized Glock and said that there were Glocks that were smaller or larger than that.

On cross-examination, Ibarra agreed that he remained friends with Jennings's father and had no fear of Jennings's family, but he added, "[A]fter today, it might change." He gave the following testimony,

> Q. You've never actually feared Mr. Jennings at all, have you?
>
> A. No.
>
> Q. No. I mean, even -- even at the time of this incident, you did not fear that he was actually going to shoot you immediately, did you?
>
> A. I didn't fear that he would shoot me, like off the bat, I guess you could say like –
>
> Q. Right.
>
> A. -- initially.
>
> . . . .
>
> Q. Okay. So you -- you did not feel imminent danger, is that -- is what I'm saying. You did not feel it was going to happen immediately or -- or within a -- you know, within a couple of seconds, you did not fear that?
>
> A. Well, I'm pretty sure everybody if somebody pulled a gun on them, they're feeling immediate danger.

Ibarra stated that Jennings never left his vehicle during the encounter and agreed that if there had been a personal problem between them, they would have worked it out in a physical manner that did not involve a gun.

Ibarra denied ever having heard Brule tell Jennings that Jennings needed a hole or bullet in his head. He did not have any personal knowledge of Brule's communicating with Jennings after their encounter because he and Brule "broke up a

little bit after that." He had been unaware that Brule had exchanged messages with Jennings within a few hours of the encounter but said that it would not surprise him because he had also exchanged communications with Jennings since then. Ibarra kept their communications cordial because his family still lived in Gainesville, where Jennings lived.

On recross-examination, when asked whether he and Brule had conspired to add the gun to their allegation "to save [his] gang pride," Ibarra replied, "If I had gang pride, I wouldn't be sitting here in this chair."

## B. Jennings's Directed-Verdict Motion

When the State rested, Jennings's attorney moved for a directed verdict, arguing that there was no evidence that he had possessed a deadly weapon based on contradictory testimony about the gun and no evidence of an imminent threat. The trial court denied the motion.[23]

## C. Analysis

Jennings complains that the trial court erred by overruling his directed-verdict motion because there was no evidence of a deadly weapon or an imminent threat.

---

[23]After the trial court denied the motion, Jennings's mother testified that she had never allowed guns in her home, that Jennings had never brought a gun into her home, that she had never seen him possess a gun, and that she had found no guns when she was forced to pack their belongings after her eviction upon Jennings's arrest.

## 1. Deadly weapon

Ibarra and Brule—testifying as reluctant witnesses—both stated that Jennings, a gang member with a firearm tattoo on his forehead, had pointed a gun in their direction; Brule stated that he had pointed the gun from underneath a white cloth, while Ibarra said the white covering was a towel. Ibarra, who was formerly associated with a gang, described the weapon based on his prior experience with firearms.

Brule's Facebook exchange with Jennings reflected that she told him that she did not call the police or tell them that he had a gun and that she denied to him that she had seen him with a gun—instead, she blamed these statements on a neighbor—and she testified that these statements to Jennings were lies that she told because she was afraid Jennings would come back and shoot up her house. Brule also told Jennings in a Facebook message that she had told Investigators Jones and Young "to go f-ck themselves," but in an email to Investigator Jones, she said she did not want to pursue charges against Jennings because it would make her family a target. Ibarra denied that he and Brule, who was no longer his girlfriend, had conspired to add a gun to their allegations.

Jennings denied to Brule in their Facebook exchange that he had had a gun, and he made the same denial to the investigating officers when they interviewed him. Officer Freeman had not seen Jennings with a firearm during their interactions, and Investigators Jones and Alford had not found Jennings in possession of a firearm on the occasions they had arrested or investigated him.

21

The jury had to assess the weight and credibility of the above evidence to determine whether Brule and Ibarra were telling the truth at trial about Jennings's having had a gun that day, and we may not re-evaluate that weight and credibility and substitute our judgment for the jury's. *See Martin*, 635 S.W.3d at 679; *Queeman*, 520 S.W.3d at 622; *see also Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."). The State need not introduce the weapon into evidence; instead, lay testimony may suffice to support a deadly-weapon finding. *See Banargent v. State*, 228 S.W.3d 393, 398–99 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

Viewing the evidence in the light most favorable to the verdict, because the jury could have chosen to believe Ibarra's testimony and to find Brule's in-court testimony more credible than her statements to Jennings on Facebook (and more credible than Jennings's statements to her on Facebook and to the police in his interview), the evidence was sufficient to establish that Jennings had a firearm, which is a deadly weapon. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A) (defining "deadly weapon" to include a firearm); *Wright v. State*, 591 S.W.2d 458, 459 (Tex. Crim. App. [Panel Op.] 1979) ("Testimony using any of the terms 'gun', 'pistol' or 'revolver' is sufficient to authorize the jury to find that a deadly weapon was used."); *see also Stringer v. State*, No. 02-19-00042-CR, 2020 WL 938150, at *3 (Tex. App.—Fort Worth Feb. 27, 2020, pet. ref'd) (mem. op., not designated for publication) (noting that a jury is free to believe

22

witnesses' testimony about seeing a gun and fearing for their lives). We overrule this portion of Jennings's third point.

### 2. Imminent threat

Ibarra testified that if Jennings had pulled the trigger, he could have hit Ibarra, Brule, their house, or something else in their direction. While Ibarra denied that he had feared Jennings "initially," he also indicated that he had felt immediate danger when Jennings drew the weapon, and Brule testified that Ibarra's face had shown his fear when Jennings pointed the gun at them. Ibarra stated that he saw Jennings brandish the gun while he was telling Brule to get in the house and that Jennings looked at him and said that he was going to "pop" Brule.

The Court of Criminal Appeals has defined "imminent" to mean "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012); *see Olivas v. State*, 203 S.W.3d 341, 350 (Tex. Crim. App. 2006) ("The fact that Ms. Tunnell perceived some threat of imminent bodily injury, coupled with the fact that appellant did use a firearm in threatening her, is sufficient to sustain his conviction for aggravated assault as charged in the indictment."). As with the deadly-weapon element discussed above, the jury had to assess the evidence's weight and credibility to determine if Jennings had intentionally or knowingly threatened Ibarra and Brule with imminent bodily injury. *See Chambers*, 805 S.W.2d at 461. Viewed in the light most favorable to the verdict, the jury could have chosen to believe Ibarra's and Brule's testimonies about

Jennings's holding the gun, pointing it in their general direction, and making a statement about "popping" one of them, to find that element. Accordingly, we overrule the remainder of Jennings's third point.

### III. PRESERVATION OF ERROR

In his first point, Jennings complains that the trial court erred by failing to instruct the jury when the State commented on his failure to testify.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Because it is a systemic requirement, we independently review error preservation and have a duty to ensure that a claim is properly preserved before addressing its merits. *See Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020).

While questioning Investigator Jones during the trial's punishment phase, defense counsel asked, "In taking these photographs, was Mr. Jennings helpful in identifying relevant street gang tattoos?" The prosecutor objected, stating, "If Mr. Jennings wants to testify to that, he can. But other than that, it's hearsay." Defense counsel then asked, "At the time you were taking these photographs, did Mr. Jennings tell you that he had renounced his affiliation with Norteños?" The prosecutor interrupted, stating, "Your Honor, once again, same objection."

24

The trial court asked the attorneys to approach the bench and gave the following warnings. To the prosecutor, the trial court stated, "Okay, I didn't like your comment about 'if he wants to testify,' okay? You're commenting on his failure to testify, so don't say that again." The trial court then cautioned defense counsel, "You're leaving the door open with that when you keep saying 'didn't he tell you, didn't he tell you,' so watch your question too, don't say that. . . . I'm just saying, you're pointing it out. I'm not going to allow you to say that question again." Jennings testified after the State rested.

While the failure of a defendant to testify shall not be alluded to or commented on by counsel, *see* Tex. Code Crim. Proc. Ann. art. 38.08, defense counsel did not object to the prosecutor's comments, ask the trial court to instruct the jury to disregard them, or move for a mistrial. *See* Tex. R. App. P. 33.1; *Hernandez v. State*, 538 S.W.3d 619, 623 (Tex. Crim. App. 2018) (referencing the traditional three steps of error preservation: objection, instruction to disregard, and motion for mistrial). Further, the record reflects that Jennings actually testified during that phase of the trial after the prosecutor's improper comments. Accordingly, because Jennings has failed to preserve this complaint for our review, and because even if he had preserved it, he would be unable to demonstrate harm, *see* Tex. R. App. P. 44.2, we overrule his first point.

## IV. DISCOVERY

In his second point, Jennings complains that the trial court abused its discretion by admitting State's Exhibit 2, a booking photo of his face, during the trial's guilt–innocence phase because the photo was not provided to the defense until the morning of trial.

Jennings was present at trial. During the first witness's testimony, the prosecutor offered the photo. Defense counsel objected, stating, "Your Honor, we were presented with this photo this morning, not given adequate time to prepare a rebuttal for the particular piece of evidence, which amounts to trial by ambush."[24]

In the ensuing bench conference, the prosecutor replied, "I can't surprise them by his face. If they didn't know that this was his face, then I don't know -- I mean, they -- I mean, [defense counsel] told me that she had seen these tattoos that I'm speaking about. There's no way this is a surprise at all. It's his face." The trial court appeared to agree, stating, "[H]ow can his face be a surprise? They can look at it there

---

[24]Defense counsel also argued that the photo's admission violated the Confrontation Clause. On appeal, Jennings argues that failure to provide the photograph before trial violated both his confrontation and due-process rights. Because Jennings did not raise due process in the trial court, that argument is not preserved. *See* Tex. R. App. P. 33.1. Further, Jennings provides no briefing on the Confrontation Clause other than quoting the Sixth Amendment, rendering this portion of his argument inadequately briefed. *See* Tex. R. App. P. 38.1(i). He also does not explain how the failure to produce a photo of his face before trial harmed him beyond a conclusory statement that "it cannot be said that [the error] did not prejudice the jury" or "contribute to the verdict of the jury." *See id.*

and see, how can his face be a surprise?" The trial court overruled the objection and admitted the booking photo into evidence.

Jennings argues that under *Watkins v. State*, 619 S.W.3d 265 (Tex. Crim. App. 2021), the photo was "clearly material evidence"[25] that should have been disclosed before the morning of trial and that the trial court erred by admitting it, prejudicing the jury. But Jennings's face was disclosed to the jury in person at trial before the photo was offered or admitted, making the photo a harmless redundancy. *See Sopko v. State*, 637 S.W.3d 252, 256–57 (Tex. App.—Fort Worth 2021, no pet.) (applying Rule 44.2(b) to Article 39.14 violation); *see also Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021) (stating that an error does not affect a substantial right under Rule 44.2(b) if the court has a fair assurance from the record as a whole that it did not influence the jury or had but a slight effect). Accordingly, we overrule Jennings's second point.

---

[25]Article 39.14(a) provides that as soon as practicable after receiving a timely discovery request from the defendant, the State "shall produce . . . any designated . . . photographs . . . that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state." Tex. Code Crim. Proc. Ann. art. 39.14(a). In *Watkins*, the Court of Criminal Appeals construed "material" to mean "having a logical connection to a consequential fact" and synonymous with "relevant." 619 S.W.3d at 290.

## V. CONCLUSION

Having overruled all of Jennings's points, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 23, 2023